IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES for the use and benefit of SEALASKA CONSTRUCTORS, LLC; and SEALASKA CONSTRUCTORS, LLC, a Washington limited liability Company, | ) ) ) ) ) ) | CIVIL NO. 13-00020 JMS-KSC<br><br>ORDER DENYING MOTIONS FOR PARTIAL SUMMARY JUDGMENT, DOC. NOS. 52, 54 |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| WALSH RMA JOINT VENTURE; WALSH CONSTRUCTION COMPANY, an Illinois corporation; RMA LAND CONSTRUCTION, INC.; a California corporation; and TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## ORDER DENYING MOTIONS FOR PARTIAL SUMMARY JUDGMENT, DOC. NOS. 52, 54

## I. INTRODUCTION

These Motions arise out of a government construction contract dispute between a subcontractor, Plaintiff Sealaska Constructors, LLC ("Plaintiff" or "Sealaska"), and the prime contractor, Defendant Walsh RMS Joint Venture

("Walsh").  Sealaska moves for partial summary judgment, seeking rulings as a

matter of law that (1) certain construction work was outside the scope of its

subcontract with Walsh, and therefore (2) Sealaska is entitled to compensation (in

an amount to be proven in later proceedings in this case) for having done that

work.  Doc. No. 52.  On the other hand, Walsh[1] moves for partial summary

judgment, essentially seeking the opposite -- a ruling that the work was *included* in

the subcontract -- and/or a ruling that Sealaska's claims are barred by waiver or

other contractual provisions.  Doc. No. 54.[2]

Based on the following, the court DENIES both Motions.  Genuine

disputes of material fact preclude summary judgment in favor of either side.

## II.  BACKGROUND

At this summary judgment stage, the court views the evidence in the

light most favorable to the non-moving party.  *See, e.g.*, *Sullivan v. Oracle Corp.*,

662 F.3d 1265, 1270 (9th Cir. 2011).  And given what are essentially cross-

motions as to the primary issue -- the meaning and extent of certain provisions of

the applicable subcontract -- the court sets forth the background by focusing on

[1]  "Walsh" refers to all Defendants, Walsh RMA Joint Venture, Walsh Construction Company, RMA Land Construction, Inc., and Travelers Casualty and Surety Company.  *See* Doc. No. 54-1, Defs.' Mot. at 1.

[2]  Walsh also seeks summary judgment as to Plaintiffs' Miller Act claim regarding certain electrical work, but the Motion as to that argument is moot.

explaining where there are factual disputes as to material issues. That is, the court explains the parties' main arguments in conjunction with setting forth the undisputed and disputed facts and evidence in the record. Because the parties are well aware of the full background of their dispute, the court reiterates only the essential details of the voluminous record as necessary to explain its ruling and make the context clear.

## A.      Factual Background

Walsh was the prime contractor on a multi-million dollar United States Army project to construct a "Tactical Equipment Maintenance Facility" (the "Project"), located at Schofield Barracks. Doc. No. 53, Pl.'s Concise Statement of Facts ("CSF") ¶ 2.[3] In turn, Walsh and Sealaska entered into a March 30, 2011 Subcontract Agreement (signed by Sealaska on April 4, 2011, and by Walsh on April 11, 2011) (the "Subcontract") for certain site work on the Project. *Id*. ¶ 3; Doc. No. 53-3, Pl.'s Ex. 1 at 1. The total value of the Subcontract is listed as $8,279,503. *Id.* The Subcontract describes the "Subcontractor's Work" as follows:

> Furnish all labor, materials, equipment, insurance, taxes, and supervision as required to fully fabricate, deliver F.O.B Project and install all **Earthwork** and **Site**

---

[3]  Where a fact is not in dispute, the court cites directly to Plaintiff's or Defendants' CSF.

3

**Utilities** as more completely described in the exhibits attached hereto, in strict compliance with the plans and specifications and as directed by Contractor.

*Id.*

### 1.     *The Subcontract's "Scope of Work"*

The present Motions concern the scope of work in the Subcontract. In particular, the primary factual question is whether the task of supplying and installing the "drainage aggregate layer and choke stone" (referred to by the parties as "task 32 11 10") is within the Subcontract's intended scope.[4] (And both parties believe the court can answer the question at summary judgment.) In the course of performing the Subcontract, Sealaska eventually notified Walsh that it considered task 32 11 10 not to be part of the Subcontract. *See, e.g.*, Doc. No. 55-9, Defs.' Ex. G. Nevertheless, Sealaska asserts that it went ahead and completed the work "for the good of the Project under a full reservation of rights," after Walsh threatened it with default if Sealaska did not perform. Doc. No. 83-1, Kent Rasmussen Decl.

---

[4] As Walsh explains it,

> [a] sub drainage system involves drainage aggregate, which is a layer of coarse gravel or rock used to allow excess surface water to seep through to a perforated pipe(s) in trenches intermittently placed throughout the project. "Choke stone" is a layer of silt that tops the drainage aggregate and acts as a barrier between the stone and the surface material (concrete or asphalt).

Doc. No. 54-1, Defs.' Opp'n at 7 n.1.

¶ 8; Doc. No. 55-15, Defs.' Ex. K at 2.  Sealaska indicates that the value of task 32

11 10 is $1,524,450.  Doc. No. 52-1, Pl.'s Mot. at 3.

　　　　The Subcontract incorporates Exhibits A to M, which are attached and

"expressly incorporated."  Doc. No. 53-3, Pl.'s Ex. 1 at 1.  The Motions focus

primarily on language in Exhibits A, B, and C.  Exhibit A consists of ten pages of

"Terms and Conditions," which are described in eleven numbered Articles.  *Id.* at

2-10.  Exhibit B defines the "Scope, Clarification, Alternates and Unit Prices,"

including the Subcontract's "Scope of Work" in Exhibit B-1.  *Id.* at 11-12.  And

Exhibit C defines the "Contract Documents" as

> consist[ing] of this Agreement, the Contract between the
> Owner [U.S. Army] and Contractor dated 25-Mar-2011,
> the General Conditions, General Requirements, and/or
> any Supplementary Conditions of the Owner Contract,
> any Addenda, Alternates, Clarifications, and all Plans,
> Drawings, and Specifications issued prior to the date of
> this Agreement and all Documents, Addenda,
> Specifications, and Plans listed below:

*Id.* at 15.  Exhibit C then lists several "Addenda," "Project Specifications," and

nine categories of "Project Drawings," which include "General Civil Sheets C-001

to C-703."  *Id.* at 15-16.

　　　　Both sides point to Exhibit B-1 of the Subcontract as being

dispositive.  Exhibit B-1 starts with this paragraph:

　　　　SCOPE OF WORK.  Subcontractor is responsible for

furnishing all engineering, designs, calculations, loads, deflections, drawings, details, layouts, submittals, data, certificates, letters, warrantees, installation instructions, schedules, labor, materials, proper storage, fabrications, shipping, tools, permits, supervision and equipment necessary for the complete Demolition, Site work, and Underground Utilities system for the Tactical Equipment Maintenance Facility (TEMF), Schofield Barracks, Oahu, HI, in accordance with the scope of work included with this exhibit.

*Id.* at 12. It follows with fifteen numbered sections, beginning with:

1. The scope of work includes the complete supply and installation of Demolition, Site work, and Underground Utilities, including Excavation, Backfill, Compaction, Dust Control, and material components as required of the Drawings and Specifications is to be performed by SEALASKA CONSTRUCTORS, is defined in the documents listed in Exhibit C, *including but not limited to*, the following:[5] [(Emphasis added).]

   a. All work associated with specification section and drawings for 02 41 00 -- DEMOLITION
   . . . .
   c. All work associated with specification section and drawings for 31 00 00 -- EARTHWORK
   . . . .
   h. All work associated with specification section and drawings for 32 11 16.16 -- BASE COURSE FOR RIGID PAVING

---

[5] This paragraph is confusing gramatically. The court interprets it to be providing that the Subcontract's scope of work is "as required of the Drawings and Specifications," and as "defined in the documents listed in Exhibit C, including but not limited to, the following:"

. . . .

l.    All work associated with specification section and drawings for 33 40 00 -- STORM DRAINAGE UTILITIES

m.    All work associated with specification section and drawings for 33 46 16 -- SUBDRAINAGE SYSTEM

n.    All work associated with specification section and drawings for 44 42 53 -- PARALLEL PLATE, GRAVITY OIL WATER SEPARATOR

*Id.*

The fourteen numbered sections that follow section one correspond to, and further describe, most of those specifications listed in paragraphs "a" to "n" in section one. For example, section two lists details of "DEMOLITION," apparently corresponding to paragraph "a" (task "02 41 00 -- DEMOLITION"). Doc. No. 53-3, Pl.'s Ex. 1 at 12. Likewise, section three describes "EARTHWORK," corresponding to paragraph "c" (task "31 00 00 -- EARTHWORK"). *Id.* Similarly, section eight covers "BASE COURSE FOR RIGID PAVING," corresponding to task "32 11 16.16 BASE COURSE FOR RIGID PAVING." *Id.* And section twelve provides details for "STORM DRAINAGE UTILITIES," corresponding to task "33 40 00 -- STORM DRAINAGE UTILITIES." *Id.* at 13.

Sealaska's primary argument is that the task in dispute (task 32 11 10

for "drainage aggregate and choke stone") is plainly *not* included in Exhibit B-1's list of fourteen specifications (section one, paragraphs "a" to "n"), and therefore the task is not within the Subcontract's scope of work. Rather, task 32 11 10 is detailed separately in an eleven-page document, which -- according to Sealaska -- further indicates the task is not part of the Subcontract. *See* Doc. No. 53-5, Pl.'s Ex. 2.

Walsh responds by emphasizing prefatory language in section one ("including but not limited to") indicates there may be other tasks besides the fourteen that follow. Walsh also stresses the following language in section thirteen of Exhibit B-1:

13.     SUBDRAINAGE SYSTEM

a.      Subcontractor is responsible for all labor, material, and equipment for a *complete sub drainage system installation* including but not limited to excavation, trenching, backfill, compaction, testing, filters and bedding material, trench lining, piping and ductile iron grate covers, etc., for a *complete and functional sub drainage system*.

b.      Subcontractor shall comply with all applicable material standards as stated in the specifications.

Doc. No. 53-3, Pl.'s Ex. 1 at 13 (emphases added).[6] According to Walsh, a "complete sub drainage system installation" and "complete and functional sub drainage system," necessarily includes "drainage aggregate and choke stone" as described in task 32 11 10. Otherwise, the logic goes, it would not be "complete." But section thirteen of Exhibit B-1 appears to correspond to task "33 46 16 -- SUBDRAINAGE SYSTEM" listed above it in Exhibit B-1's list of fourteen specifications. If so, it does not refer to task 32 11 10, which (according to Sealaska) is a separately definable task, distinct from task 33 46 16.

It is thus unclear whether task 32 11 10 was (1) meant to be encompassed within task 33 46 16; (2) inadvertently or mistakenly omitted from the list of fourteen specifications in Exhibit B-1, but nevertheless falls within the Subcontract's scope based upon *other* language of the Subcontract; or (3) actually intentionally omitted from the Subcontract because the parties never intended it to be part of the Subcontract's scope.

The parties also point to sheet drawing "C-522" depicting certain "subdrain details." *See* Doc. No. 55-5, Defs.' Ex. C. (As set forth above, drawing

_____

[6] Likewise, Walsh points to earlier language in Exhibit B-1, stating in part that "Subcontractor is responsible for furnishing *all* engineering, designs, calculations, loads, deflections, drawings, details, layouts, submittals, data, certificates, letters, warrantees, installation instructions, schedules, labor, materials, proper storage, fabrications, shipping, tools, permits, supervision and equipment necessary for the *complete* Demolition, Site work, and Underground Utilities" for the Project. Doc. No. 53-3, Pl.'s Ex. 1 at 12 (emphases added).

"C-522," among many others, is a "Contract Document," one of the incorporated "General Civil Sheets C-001 to C-703" listed in Exhibit C to the Subcontract for which Sealaska is responsible.  *See* Doc. No. 53-3, Pl.'s Ex. 1 at 15.)  The drawing includes cut-away views of, for example, the "typical interior subdrain detail" and "interior subdrain adjacent to drain line detail."  Doc. No. 55-5, Defs.' Ex. C.  And the drawing contains several references to "drainage aggregate" and "choke stone," which -- Walsh asserts -- indicate that task 32 11 10 for "drainage aggregate and choke stone" was included in the Subcontract.

But Sealaska contends that drawing C-522 actually depicts four separate tasks:  (1) task 32 13 11 for "concrete pavement for roads and hardstands;" (2) task 32 11 10 for "drainage aggregate and choke stone;" (3) task "33 46 16" for a "subdrainage system;" and (4) task 32 11 16.16 for "base course for rigid paving."  *See* Doc. No. 80, Pls.' Opp'n at 31.  Sealaska argues that, even if C-522 is a "Contract Document" included as part of the Subcontract, Sealaska is only responsible for the latter two tasks as specifically set forth in Exhibit B-1 (and is not responsible for the first two tasks -- including task 32 11 10 -- which are not listed in Exhibit B-1).

**2.** *Conflicting Evidence of Intent*

In support of its position, Sealaska emphasizes evidence that, on April 14, 2011 (only three days after Walsh signed the Subcontract), Walsh prepared or revised a "Subcontractor/Supplier Responsibility Chart" that lists and details 127 different subcontractor tasks. Doc. No. 83-5, Pl.'s Ex. 7. Walsh's chart includes all fourteen of the tasks listed in Exhibit B-1 of the Subcontract's "Scope of Work," and refers to those tasks as being Sealaska's responsibility. *Id.* The chart, however, lists task "32 11 10" as being the responsibility of "the Asphalt Sub" (that is, *not* the responsibility of Sealaska). Doc. No. 83-5, Pl.'s Ex. 7 at 6. Sealaska infers that this chart proves that Walsh itself did not intend task 32 11 10 to be included in the Sealaska Subcontract. Sealaska also points to a *different* proposed "Exhibit B," dated April 4, 2011, for a *different* subcontract (perhaps the "Asphalt Sub") that includes "all work associated with specification section and drawings for 32 11 10 -- DRAINAGE AGGREGATE AND CHOKE STONE." Doc. No. 84-1, Pl.'s Ex. 8 at 1.

Likewise, Kent Rasmussen, who is Sealaska's Director of Operations, declares that Dennis McBride (managing member of Walsh) "admitted . . . that the 32 11 10 work was not included in Sealaska's Subcontract and that it was not included in the Subcontract because of 'administrative oversight' by [Walsh]."

Doc. No. 83-1, Rasmussen Decl. ¶ 7.  Other similar evidence, construed in favor of

Sealaska, supports such an "admission" by Walsh.  *See, e.g.*, Doc. No. 84-6, Pl.'s

Ex. 13 at 1 ("Walsh RMA referred to it as an 'administrative oversight' on its

part.").

On the other hand, Walsh points to similar evidence indicating that

*Sealaska* considered task 32 11 10 to be its responsibility -- Sealaska was actually

performing the task by purchasing aggregate (rocks, stone, etc.) for use in the

subdrainage system.  *See* Doc. No. 55-7, Defs.' Ex. E.  For example, in July of

2011, Sealaska submitted documents indicating it was "awaiting approval" for its

purchase or installation of "Drainage Aggregate layer for below pavement

construction and subdrain."  *Id.* at 2.  This Sealaska document referred to the

"responsible company" for "specification section 32 11 10" as "Sealaska

Constructors."  *Id.*  A similar Sealaska document regarding "Choke stone layer for

stabilization of drainage layer" refers to "Sealaska Constructors" as the

"responsible company" for "32 11 10."  *Id.* at 7.  *See also, e.g.*, Doc. No. 83-4,

Pl.'s Ex. 6 at 16 (Rule 30(b)(6) deposition of Robert Wysocki of Sealaska,

testifying "We did the work.  [Justin Vena, of Sealaska] thought [in July or August

2011] it was in our contract.").

### 3.     *Notice and Waiver Provisions*

Walsh also contends that not only did Sealaska begin performing task 32 11 10 as if were responsible for it, but Sealaska waited eighteen months after the Subcontact's execution to notify Walsh that it did not consider the task to be part of the Subcontract.  Doc. No. 54-1, Defs.' Mot. at 12.[7]  Walsh argues that Sealaska's claim is late, citing a notice provision of the Subcontract regarding "claims," which provides:

> 4.3  A "Claim" is a Subcontractor's demand or assertion seeking, as a matter of right, an increase in Subcontract Amount, an extension in the time for performance of Subcontractor's Work, or relief with respect to the terms of the Contract.  All Claims must be made by written notice to the Contractor *at least one (1) week prior to the beginning of the Subcontractor's affected or additional work*, or the date by which Contractor is obligated to give notice to the Owner with respect to such claim, or within one (1) week of the Subcontractor's first knowledge of the event, *whichever shall first occur*, otherwise, such claims shall be deemed waived.

Doc. No. 55-6, Defs.' Ex. D at 4 (Ex. A to Subcontract); Doc. No. 53-3, Pl.'s Ex. 1

---

[7]  But there is some indication that Sealaska did not actually start "performing" task 32 11 10 until the summer of 2012.  *See, e.g.*, Doc. No. 85, Pl.'s Ex. 15 at 63-64 (testimony of Chad Johnson of Walsh indicating that as of a March 2012 Sealaska pay application, "none of the specification Section 32 11 10 drainage layer work had began," and that the 32 11 10 work "didn't start until later in the summer [of 2012]").  Construction documents (daily logs) indicate that Sealaska "[s]tarted placing drainage layer" on June 21, 2012.  Doc. No. 55-8, Defs.' Ex. F at 1.  That is, although Sealaska may have begun the process of procuring materials in 2011, it might not have begun actually "performing" the task until the summer of 2012.

at 4 (Ex. A to Subcontract) (emphases added). By waiting so long, Walsh contends, Sealaska waived any claims against Walsh as to task 32 11 10.

Similarly, Walsh contends Sealaska has waived any right to recovery because Sealaska signed comprehensive releases in conjunction with periodic payments Walsh made to Sealaska during the Subcontract period (at least up to July 31, 2012 -- the date of the last applicable payment). *See* Doc. No. 55-11, Defs.' Ex. I (providing eleven "Partial Waiver and Release of Claims For Payment" forms, containing a release of all "suits, debts, demands, torts, charges, causes of action and claims for payment, including claims under . . . the Miller Act . . . on account of, arising out of, or relating in any way to the labor, services, material, fixtures, equipment, apparatus or machinery furnished by [Sealaska] . . . from the beginning of time through the date indicated below, including extras").

The first written notification to Walsh by Sealaska regarding the task 32 11 10 issue was made on October 10, 2012. *See* Doc. No. 55-9, Defs.' Ex. G (letter from Sealaska to Walsh stating "we believe that [drainage layer] work to be out of scope for Sealaska Constructors and we request a change order or equitable adjustment to compensate for value of the work"). On October 12, 2012, Walsh responded with a letter disagreeing, asserting that task 32 11 10 was Sealaska's responsibility. Doc. No. 55-10, Defs.' Ex. H. After various letters between the

parties, and conferences discussing the issue, Walsh sent a letter to Sealaska on December 12, 2012, detailing its position and indicating that "[Sealaska] will be in default of the Subcontract if it [fails to perform the balance of the drainage layer and choke stone work]." Doc. No. 55-15, Defs.' Ex. K at 1.

Sealaska then finished task 32 11 10 and, consistent with a "reservation of rights," filed this action on January 14, 2013. Doc. No. 1. Sealaska's Complaint alleges six Counts: Count One (declaratory relief); Count Two (breach of contract); Count Three (mistake); Count Four (negligent misrepresentation); Count Five (unjust enrichment); and Count Six (recovery under a payment bond under the Miller Act, 40 U.S.C. § 3133). *Id.*

## B.     Procedural Background

Sealaska filed its Motion for Partial Summary Judgment on November 13, 2013, Doc. No. 52, limited to seeking declaratory relief under Count One regarding the scope of work of the Subcontract. Walsh filed its corresponding Motion the same day. Doc. No. 54. Oppositions were filed on February 14, 2014, Doc. Nos. 78, 80, and Replies followed on February 24, 2014. Doc. Nos. 87, 88. The court heard the Motions on March 10, 2014.

///

///

# III.  STANDARD OF REVIEW

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56 [(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  The nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (citations omitted)).

## IV. <u>DISCUSSION</u>

### A. The Subcontract Is Ambiguous as to Task 32 11 10

Given the court's review of the background facts and the parties' positions set forth above, the court has little difficulty concluding that genuine issues of material fact exist as to the scope of the intended work on the Subcontract. Although both sides believe that the Subcontract's "plain meaning"

works in their favor (and thus both sides conclude that the issue is ripe for summary judgment), the court disagrees -- the Subcontract is ambiguous, and there is conflicting evidence as to whether task 32 11 10 was intended to be part of the Subcontract, rendering summary judgment improper. *See HRPT Props. Trust v. Lingle*, 676 F. Supp. 2d 1036, 1044 (D. Haw. 2009) ("While the parties all contend that there is no genuine issue of material fact, this court finds nothing in the record establishing the original contracting parties' intent. That intent is by no means clear from the [contracts] themselves. When the contract is unclear, and there is some doubt as to the intent of the parties, that intent is a question of fact.") (citing *Found. Int'l, Inc. v. E.T. Ige Constr.*, 102 Haw. 487, 497, 78 P.3d 23, 33 (2003)). That is, the Subcontract's meaning as to task 32 11 10 is "plain" only from each party's own perspective. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 737 (1985) (observing that "plain meaning, like beauty, is sometimes in the eye of the beholder").

        In reviewing the Subcontract, the court applies well-established principles of Hawaii law.[8] "The court's objective is to ascertain and effectuate the intention of the parties as manifested by the contract in its entirety." *Hawaiian*

---

        [8] Hawaii law applies in interpreting the Subcontract. *See* Doc. No. 55-6, Defs.' Ex. D at 9 ("This [Subcontract] shall be governed by the law of the state in which the Project is situated.").

*Ass'n of Seventh-Day Adventists v. Wong*, 130 Haw. 36, 45, 305 P.3d 452, 461

(2013) (citation and internal quotation marks omitted). "Absent an ambiguity,

[the] contract terms should be interpreted according to their plain, ordinary, and

accepted sense in common speech." *Cho Mark Oriental Food, Ltd. v. K & K Int'l*,

73 Haw. 509, 520, 836 P.2d 1057, 1064 (1992) (citation omitted). "A contract is

ambiguous when its terms are reasonably susceptible to more than one meaning."

*Wong*, 130 Haw. at 45, 305 P.3d at 461 (citation omitted).

> "As a general rule, the court will look no further than the four corners

of the contract to determine whether an ambiguity exists." *Id.* (citing *State Farm*

*Fire & Cas. Co. v. Pac. Rent-All*, 90 Haw. 315, 324, 978 P.2d 753, 762 (1999)

(noting that the parties' disagreement as to the meaning of a contract does not

render it ambiguous)). But, in determining whether an agreement is ambiguous,

> the test lies not necessarily in the presence of particular
> ambiguous words or phrases but rather in the purport of
> the document itself, whether or not particular words or
> phrases in themselves be uncertain or doubtful in
> meaning. In other words, a document may still be
> ambiguous although it contains no words or phrases
> ambiguous in themselves. The ambiguity in the
> document may arise solely from the unusual use therein
> of otherwise unambiguous words or phrases. An
> ambiguity may arise from words plain in themselves but
> uncertain when applied to the subject matter of the
> instrument.

*Id.* at 46, 305 P.3d at 462 (quoting *Hokama v. Relinc Corp.*, 57 Haw. 470, 474-75,

559 P.2d 279, 282 (1977)) (emphasis omitted).  "Where there is an ambiguity, parol evidence is admissible to explain the intent of the parties, and intent then becomes a question for the trier of fact."  *Seascape Dev., LLC v. Fairway Capital, LLC*, 2011 WL 1134296, at *7 (D. Haw. Mar. 23, 2011) (citations omitted).  "The intent of the parties is a question of fact, and '[i]nasmuch as the determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable men might differ, summary judgment often will be an inappropriate means of resolving an issue of that character.'"  *Hanagami v. China Airlines, Ltd.*, 67 Haw. 357, 364, 688 P.2d 1139, 1145 (1984) (quoting *Bishop Trust Co. v. Cent. Union Church*, 3 Haw. App. 624, 628-29, 656 P.2d 1353, 1356 (1983)).

Applying those standards, the Subcontract is certainly ambiguous as to task 32 11 10.  As established above, it is unclear whether task 32 11 10 was (1) meant to be encompassed within task 33 46 16; (2) inadvertently or mistakenly omitted from the list of fourteen specifications in Exhibit B-1, but nevertheless falls within the Subcontract's scope based upon *other* language of the Subcontract; or (3) intentionally omitted from the Subcontract because the parties never intended it to be part of the Subcontract's scope.  For example, although Sealaska asserts that task 32 11 10 is not listed on Exhibit B-1, it is also undisputed that

Exhibit B-1 states that the scope of the work is "not limited to" the fourteen tasks that follow. (Sealaska's response is that this stock phrase cannot be read to include a $1.5 million task such as 32 11 10 which is specifically defined elsewhere.) Likewise, it is unclear whether *all* the tasks depicted on drawing "C-522" were meant to be done by Sealaska, or whether the drawing includes other tasks originally meant for other subcontractors.[9]

And the extrinsic evidence is also disputed. There is evidence that task 32 11 10 was always intended to be part of the Subcontract. *See, e.g.*, Doc. No. 83-1, Rasmussen Decl. ¶ 7 (indicating task 32 11 10 was not included because of "administrative oversight" as admitted by Walsh); Doc. No. 55-7, Defs.' Ex. E (Sealaska documents indicating Sealaska was responsible). But there is also extrinsic evidence that the task was not. *See, e.g.*, Doc. No. 83-5, Pl.'s Ex. 7 at 6 (Subcontractor Responsibility Chart indicating Walsh considered the task not Sealaska's responsibility); Doc. No. 83-1, Rasmussen Decl. ¶ 4 ("[L]arge quantities of rock were being purchased . . . well in excess of anything Sealaska had contracted for or had in its Subcontract scope or price.").

---

[9] The parties have not analyzed the issues in terms of the contractual/equitable doctrines of "mistake," and "unjust enrichment," although they are plead in Counts Three and Five of the Complaint (and might apply to the facts before the court). *See* Doc. No. 1, Compl. at 9-10. That is, the Motions are limited to assertions that the scope of work of the Subcontract is unambiguous as a matter of law.

In short, summary judgment is inappropriate based on an ambiguous Subcontract, and conflicting evidence of intent.

**B.     Questions of Fact Remain as to the Effect of the Notice Provision, and the "Partial Waiver and Release of Claims for Payment" Forms**

*1.     Notice Provision*

Walsh next argues that Sealaska's claims are barred for failure to comply with the Subcontract's notice provision in paragraph 4.3 of Exhibit A to the Subcontract.  That paragraph requires any "demand or assertion" by Sealaska "seeking, as a matter of right, an increase in Subcontract Amount, an extension in the time for performance of Subcontractor's Work, or relief with respect to the terms of the Contract" to be made in writing to Walsh,

> *at least one (1) week prior to the beginning of the Subcontractor's affected or additional work*, or the date by which Contractor is obligated to give notice to the Owner with respect to such claim, or within one (1) week of the Subcontractor's first knowledge of the event, *whichever shall first occur*, otherwise, such claims shall be deemed waived.

Doc. No. 55-6, Defs.' Ex. D at 4; Doc. No. 53-3, Pl.'s Ex. 1 at 4 (emphases added). Because Sealaska did not provide Walsh notice at least one week before Sealaska began task 32 11 10 (the "affected or additional work"), Walsh contends that Sealaska waived *all* its task 32 11 10 claims.  Specifically, Walsh "requests that this Court grant partial summary judgment against Sealaska with respect to any

claims premised upon Sealaska's contention that the drainage aggregate and choke stone scope of work was not part of its Subcontract[.]" Doc. No. 54-1, Defs.' Mot. at 3-4.

The court disagrees. Genuine issues of material fact preclude Walsh's request to bar, as a matter of law, all of Sealaska's claims seeking relief based on the Subcontract's scope of work (assuming Sealaska's claim for an "equitable adjustment" from Walsh based on task 32 11 10 would otherwise constitute "an increase in Subcontract Amount" or "relief with respect to the terms of the Contract" for purposes of paragraph 4.3).

Initially, Sealaska responds to Walsh by arguing -- assuming its written notice was late -- that Walsh cannot demonstrate any prejudice. Sealaska contends that the purpose of the notice provision is to give Walsh the opportunity (before a subcontractor incurs the expenses of any extra work) to address the claim, to monitor costs, to find less expensive alternatives, and/or to seek to "pass through" such extra work to the owner (here, the Army) -- all of which, Sealaska contends, are inapplicable or are disputed factual matters.

And there is authority generally requiring a showing of prejudice before enforcing such a notice provision, depending upon the circumstances, at least in federal construction contracts. *See, e.g.*, *Hoel-Steffen Constr. Co. v. United*

*States*, 456 F.2d 760, 766, 768 (Cl. Ct. 1972) (reasoning that applying a notice provision in a contract-adjustment clause too technically violates its purpose, which is to allow officials "to collect data on the asserted increase in cost" and "evaluate the desirability of continuing" the conduct); *Nat Harrison Assocs. v. Gulf States Utils.*, 491 F.2d 578, 583 (5th Cir. 1974) ("The obvious purpose of notice provisions . . . is the protection of the owner against mistaken or fraudulent charges in the work under the contract."); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1392 (Fed. Cir. 1987) ("The delay in the assertion of a claim by a contractor inevitably causes some degree of prejudice to the government; however, the existence of prejudice resulting from the dilatory notice usually serves to increase the burden of persuasion facing the contractor asserting its claim for equitable adjustment rather than to bar its claim entirely.") (citation omitted); *Calfon Constr. Inc. v. United States*, 18 Cl. Ct. 426, 438-39 (1989) (discussing cases and scenarios examining whether prejudice occurs by failure to provide timely written notice as to constructive changes); *Seaboard Lumber Co. v. United States*, 45 Fed. Cl. 404, 407 (1999) ("[T]he question is whether the lack of notice [by the contractor] caused any real prejudice to the government's ability either to

defend against the contractor's claim, or to limit damages.").[10]

The court, however, need not decide whether a specific showing of prejudice is required under Hawaii law. Even if the notice clause could be enforceable in the absence of prejudice, it would not bar *all* of Sealaska's equitable adjustment claim based on task 32 11 10. Rather, at most only part of Sealaska's claim would be waived because, construing evidence in the light most favorable to Sealaska, Sealaska might still be entitled to recover for work that had not yet begun (especially if Sealaska prevails in its contention that task 32 11 10 was in fact *not* part of the Subcontract's intended scope of work). *See, e.g.*, *United States ex rel. Warren Painting Co. v. J.C. Boespflug Constr. Co.*, 325 F.2d 54, 61-62 (9th Cir.

---

[10] In contrast, some state courts require strict compliance with state public construction-contract notice provisions. *See, e.g.*, *Mike M. Johnson, Inc. v. Cnty. of Spokane*, 78 P.3d 161, 167-68 (Wash. 2003) (en banc) (holding that contractor's failure to strictly comply with contractual claim procedure barred claim for additional compensation, despite county's actual notice of claim); *but see id.* at 175 ("The general rule is that a contractor does not forfeit his claim to equitable adjustment merely because he had failed to technically comply with a contract's notice provisions; the owner must also show that he has actually suffered prejudice.") (citations omitted) (Chambers, J. dissenting). Other state courts, however, consider prejudice. *See H.E. Contracting v. Franklin Pierce Coll.*, 360 F. Supp. 2d 289, 294 (D. N.H. 2005) ("Contract provisions requiring that change orders be in writing have been upheld by New Hampshire courts unless the owner has actual knowledge of the additional work and is not prejudiced by the contractor's failure to comply with the writing requirement.") (citations omitted).

The parties have not cited, and the court's research has not found, a Hawaii opinion specifically deciding whether prejudice is required to enforce a similar notice clause in a public construction contract or subcontract. *Koga Engineering v. State of Hawaii*, 122 Haw. 60, 222 P.3d 979 (2010), cited by Plaintiff, determined that the owner must demonstrate prejudice by a late notification seeking additional compensation, but such a prejudice requirement was part of the contract itself, *see id.* at 73, 222 P.3d at 992 -- and thus is not dispositive.

1963) (precluding recovery for ongoing "extra work" prior to the required notice period, but allowing possible recovery for the same type of work performed after the date of the written notice); *Associated Mech. Contractors, Inc. v. Martin K. Eby Constr. Co.*, 271 F.3d 1309, 1315-16 (11th Cir. 2001) ("But even assuming that Associated failed to give timely notice for the delays suffered from May through July 1990 and that damages for such delays are not recoverable, from the record before us it appears that those damages are a small part of the total damages[.]. . . [W]e must remand for the district court (or the trier of fact, if there is a disputed issue of fact) to determine which claims were barred by failure to give timely notice and which were preserved.").

And, although "[t]hese [notice] clauses in construction contracts make the written order a condition precedent to an enforceable right to payment for extra work," *Nat Harrison Assocs*., 491 F.2d at 583, "[t]here is a point, however, at which changes in the contract are considered beyond the scope of the contract and inconsistent with the 'changes' section." *Id.* (citation omitted). That is, in some situations, "[d]amages can be recovered without fulfillment of the written notice requirement where the changes are outside the scope of the contract and amount to

a breach." *Id.*[11]

Moreover, there is evidence that Sealaska's claim for equitable reimbursement for task 32 11 10 (which was not complete when Sealaska gave written notice to Walsh) can be divided into pre- and post-notice tasks. *See* Doc. No. 84-6, Pl.'s Ex. 13 (December 2012 letter from Sealaska to Walsh, stating "[a]s Walsh RMA requested enclosed are Sealaska Constructors, LLC's cost breakdowns for the drainage layer and choke stone work related to Specification Section 32 11 10. The first cost breakdown is for the $1,045,950.77 of work Sealaska has already performed. The second cost breakdown is an estimate for the remainder of this work, which totals $633,636.53. Please issue a change order for

---

[11] *Nat Harrison Associates* arose out of a dispute where the contractor issued a "revision order" to its subcontractor, and the subcontractor in turn failed to comply with the notice provision in seeking additional payment for that extra work. 491 F.2d at 582-83. Similarly, it may be that, here, ¶ 4.3 was intended to apply where the contractor required the subcontractor to perform additional work, with ¶ 4.3 then requiring timely written notice that the subcontractor seeks "an increase in Subcontract Amount, an extension in the time for performance of Subcontractor's work, or relief with respect to the terms of the Contract" because of that additional work. Doc. No. 55-6, Subcontract Ex. A ¶ 4.3.

The notice provision in ¶ 4.3 is in a section regarding "Changes, Claims and Delays," where (1) ¶ 4.1 regarding "Changes" provides that "[w]hen the Contractor so orders in writing, the Subcontractor . . . shall make any and all changes in the Work which are within the general scope of this Agreement;" and (2) ¶ 4.2 regarding "Changed Work at Time and Material" provides that "[t]he Contractor may order changed work to be performed on a time and material basis . . . . Upon receipt of such notice, Subcontractor will perform the work and will accept in full payment thereof an amount equal to the direct cost of labor and materials actually and reasonably used to perform such changed work[.]" *Id.* And so it may be that ¶ 4.3 does not directly apply to the current dispute, which does not arise from a traditional change order from the contractor to the subcontractor. The court, however, need not resolve this question, which was not raised or briefed, because the court denies Walsh's Motion on other grounds.

27

the work."). That is, there are disputes of fact as to exactly when Sealaska actually

began the task 32 11 10 work, and whether (and by how much) such work was

complete in October 2012 when notice was given. In short, the court agrees with

Sealaska's argument that Walsh can raise any lack of proper notice as a "defense[]

to Sealaska's claim for compensation." Doc. No. 80, Pl.'s Opp'n at 33. *See*

*Mingus Constructors, Inc.*, 812 F.2d at 1392 ("[T]he existence of prejudice

resulting from the dilatory notice usually serves to increase the burden of

persuasion facing the contractor asserting its claim for equitable adjustment rather

than to bar its claim entirely.").

> ## 2. *Waivers and Releases in Claim Forms*[12]

Lastly, Walsh argues that Sealaska waived any right to recovery for its

task 32 11 10 claims, at least up to July 2012, because Sealaska signed releases of

all "suits, debts, demands, torts, charges, causes of action and claims for payment,

including claims under . . . the Miller Act . . . on account of, arising out of, or

---

[12] Walsh also moves as to Sealaska's claim under the Miller Act for certain electrical trenching work. Doc. No. 54-1, Defs.' Mot. at 26-29. But this claim is moot because Sealaska has since received payment for such work and is not pursing this claim against Walsh. Doc. No. 80, Pl.'s Opp'n at 40. Although Walsh contends that there is still a question regarding its entitlement to attorneys' fees related to this claim, Doc. No. 88, Defs.' Reply at 22, Walsh does not dispute that Sealaska has been paid (apparently by another entity). Such a remaining dispute regarding fees, however, is not part of the current Motions. The court thus need not address Walsh's argument that the electrical trenching work is precluded as a "third-tier" claim under the Miller Act.

relating in any way to the labor, services, material, fixtures, equipment, apparatus or machinery furnished by [Sealaska] . . . from the beginning of time through the date indicated below, including extras."  Doc. No. 55-11, Defs.' Ex. I (providing eleven "Partial Waiver and Release of Claims For Payment" forms).  Sealaska apparently was required to sign these releases on receipt forms when receiving periodic payments under the Subcontract.  *See, e.g.*, Doc. No. 83-1, Rasmussen Decl. ¶ 9.  As with the other issues raised in the Motions, genuine issues of material fact preclude barring Sealaska's task 32 11 10 claims at this stage of the litigation.

Specifically, it is disputed (1) whether task 32 11 10 claims were known by Sealaska when the releases were executed, and (2) whether such releases function to release unknown claims.  *See id.* ¶¶ 9-11; Doc. No. 83-4, Pl.'s Ex. 6 at 7-8.  And, in any event, there is a dispute as to whether the last release at issue, which covers only up to the end of July 2012, would waive task 32 11 10 claims for all work performed after that date.  *See, e.g.*, *Coon v. City & Cnty. of Honolulu*, 98 Haw. 233, 261, 47 P.3d 348, 377 (2002) ("Generally, waiver is defined as an intentional relinquishment of a known right[.]") (quoting *In re Estate of Searl*, 72 Haw. 222, 226-27, 811 P.2d 828, 831 (1991)).  Summary judgment is therefore improper.  *See, e.g.*, *W. Chance No. 2, Inc. v. KFC Corp.*, 957 F.2d 1538, 1543 (9th

Cir. 1992) ("[T]he terms of the General Release seem to limit its application to claims held . . . at the time the General Release was executed. It did not, and probably could not, operate to extinguish future claims. . . . In any event, the intended scope of the General Release and its effect, if any, . . . are material disputed facts.").

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the court DENIES both Plaintiff's Motion for Partial Summary Judgment, Doc. No. 52, and Defendants' Motion for Partial Summary Judgment, Doc. No. 54.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, April 16, 2014.



       /s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*United States ex. rel. Sealaska Constructors, LLC, et al.*, Civ. No. 13-00020 JMS-KSC, Order Denying Motions for Partial Summary Judgment, Doc. Nos. 52, 54